FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2012 JUL 10 PM 1: 44

U.S. DISTRICT COURT
DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | | |
|---|---|---|
| MARAJ KIDWAI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No.: 6: 12-CV-1061 Orl - 3 7GJK |
| | § | |
| ST. MATTHEW'S UNIVERSITY | § | |
| SCHOOL OF MEDICINE. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

TO THE HONORALBE JUDGE OF SAID COURT:

COMES NOW, Maraj Kidwai, Plaintiff in the above styled and numbered cause and files this, his Plaintiff's Original Complaint and Demand for Jury Trial and for causes of action would plead as follows:

### I. Parties and Personal Jurisdiction

1.      The Plaintiff, Maraj Kidwai (Plaintiff or Kidwai), is a natural person, residing at 20303 Fairway Trails Lane, Spring, Texas 77379. From January 2007 through April 2012 Kidwai had been continuously enrolled in St. Matthews University School of Medicine. However, under the policy change that forms the basis of the Plaintiff's complaint he was involuntarily withdrawn on or about April 8, 2012

2.      Defendant St. Matthews University School of Medicine (Defendant or SMU) is a foreign medical school located in the Cayman Islands with its campus address at P.O. Box 30992, Grand Cayman, KY1-1204, Cayman Islands and its administrative offices at 12124 High Tech Avenue, Suite 350, Orlando, Florida 32817. SMU is a small, obscure

medical school located in the Cayman Islands, but has continuing and systematic contacts with the state of Florida by virtue of its administrative offices at the Orlando address set forth above. SMU conducts mandatory clinical rotations through Florida Hospital, mostly in and around Orlando and the Plaintiff did most of his core rotations as well as some electives there. In addition Plaintiff attended a 5th semester, technically still basic sciences, in Miami, Florida. From its Florida administrative offices SMU conducts an array of school related functions and activities including its graduation ceremonies. Therefore under the Florida Long Arm Statute, Fla Stat. §48.193 et. seq, SMU operates, engages in and/or carries on a business in the state of Florida and/or breached a contract in Florida. SMU has sufficient related and unrelated minimum contacts to make itself amenable to the jurisdiction of United States courts. SMU can be served with citation and summons by serving an officer at 12124 High Tech Avenue, Suite 350, Orlando, Florida 32817. This Court therefore has personal jurisdiction over the Defendant SMU.

## II. Subject Matter Jurisdiction and Venue

3.     This Court has subject matter jurisdiction over this case pursuant to the provisions of 28 U.S.C.A §1332 in that complete diversity of citizenship exists between the Plaintiff, a resident of the State of Texas and the defendant who is either a Florida residents and/or a resident of a foreign country.  In addition the amount in controversy exceeds $75,000. Venue is proper in the United States District Court for the Southern District of Texas pursuant to the provisions of 28 USCA §1391 (a) (2) and (3),  (c) & (d).

### III. Statement of Facts

4.      In January 2007 the Plaintiff enrolled in SMU as a transfer medical student from St. George's University Medical School of Grenada. SMU is a medical school located on Grand Cayman, Cayman Island, British West Indies. Plaintiff was recruited via the internet and United States mail through SMU's administrative offices located in Orlando, Florida. Tuition at SMU was approximately $11,000 per trimester. SMU requires ten full payments, but because Plaintiff transferred to SMU after his first semester, he was required to pay only nine. Eight of the Plaintiff's payments totally $86,420 were made prior to May 6, 2010 when SMU unilaterally and without adequate notice, altered its graduation requirements. In 2008 SMU lost its ability to provide financial aid for its students, and as a result Plaintiff has paid out-of pocket almost $60,000 for tuition and fees and almost $100,000 for living expenses associated with his various clinical rotations. In addition Plaintiff owes another $91,331 for the financial aid he received. As of the date of this complaint Plaintiff has expended almost $250,000 in tuition, fees and living expenses in an effort to obtain a medical degree from SMU.

5.      SMU's curriculum is set up so that students attend classes at the Grand Cayman campus until they have successfully completed all the basic science classroom courses necessary to begin actual clinical rotation and have passed Step 1 of the USMLE exam. At that point students receive their clinical training at a hospital (s) or medical facility (ies) in the United States or select locations in England. Plaintiff received his clinical training and completed his rotations at various medial facilities in the United States including Florida Hospital in Orlando, Florida, AIME/Norwegian American Hospital in Chicago, Illinois, Northern Virginia Mental Health Institute, Florida Hospital in

Kissimmee, Florida and the Broward County Medical Examiners' Office in Ft. Lauderdale, Florida.

6.    When Plaintiff enrolled in January 2007 SMU's graduation requirements were clearly defined in the student handbook.  In addition to completing all the required classes with a passing grade point average and passing all clinical rotations, a student seeking to graduate had to satisfy the following:

-Meet all of the financial obligations of the medical school.

-Have all required administrative documents on file at least two weeks prior to graduation.

-Submit an **Intent to Graduate** (ITG) form to one's Clinical Coordinator.

-Pay the $500 graduation fee.

As of the date of this complaint Plaintiff has paid over $100,000 in tuition and fees as required and in a timely manner, filed all of the necessary documents in a timely manner, submitted his intent to graduate form, and was prepared to pay his $500.00 graduation fee, which SMU continued to invoice him for despite not allowing him to graduate. The graduation requirements in place in 2007 remained virtually identical for three and a half years.  In May 2010, with Plaintiff in his fourth year and having completing over 50% of his clinical rotations, SMU changed its graduation requirements to add an additional state medical licensing requirement as a precondition to graduation.

7.    USMLE is an acronym that stands for United States Medical Licensing Examination.  At the time Plaintiff enrolled in January 2007, USMLE Step 1 was required by SMU in order for Plaintiff or any other student to begin clinical rotations and the Plaintiff was on notice of this requirement when he enrolled. Plaintiff took and successfully passed the USMLE Step 1 exam as evidenced by his starting and completing

4

of his clinical rotation. However, USMLE step 2 was never a graduation requirement prior to May, 6 2010. SMU did utilize a comprehensive examination, the NBME, for each core clinical rotation and Plaintiff was aware of this requirement as well. The NBME test score counted for 30% of a student's clinical rotation grade and Plaintiff successfully completed all of his clinical rotations. However, on May 6, 2010 SMU, acting through its Board of Trustee, unilaterally and without warning altered its graduation requirements to require anyone graduating on or after August 15, 2010 to pass both the Clinical Skills (CS) and Clinical Knowledge (CK) portions of the USMLE Step 2 exam. Plaintiff was given one year from the completion of his clinical rotations to do so.

8.     Once a student reaches the point where he or she is entering his or her clinical rotations the ability to transfer to another medical school becomes difficult if not impossible. Transferring options vary from one school to the next. Some schools will not allow a transfer student at all regardless of what stage of study he or she is in. Others may allow transferring but only if a student starts his course of study over again, in effect forcing a student to enroll as a new student and making the notion of a transfer meaningless. Some schools allow transfers but force students to go back to their third year or earlier. The completion of a student's basic sciences generally serves as a point where transferring is either impossible because of the restrictions imposed by the new school, or the economic demands of starting over or going back are too onerous to overcome. SMU only allows students to transfer at a point no later than the completion of their second year. Therefore, when SMU and its Board altered the graduation requirements it did so at a point where Plaintiff had paid over $86,000 of his total tuition

and under circumstances where he could no longer successfully transfer to another medical school.

9.     There are at numerous schools in the Caribbean that do not require the USMLE Step 2 as a precondition to graduation. Had Plaintiff been afforded any reasonable notice of SMU's change in graduation requirements he could have transferred prior to beginning his clinical rotations. The change in graduation requirements came in May 2010 and became effective for persons graduating on or after August 15, 2010.     Plaintiff completed his clinical rotation in April 2011 and should have graduated in May 2011. From the time he enrolled in January 2007 until he completed his clinical rotations he remained on schedule to graduate in 2011. He did nothing over that period that delayed his graduation or in any way set him back. Because of the new impediment to graduation Plaintiff began to take the USMLE in June 2010 in order to even have a chance to graduate when he had originally planned. He took the CS exam twice and passed it on his second attempt in early 2011. However, he did not pass the CK portion after three attempts, two of which came while he was still doing his clinical rotations and the final effort in July 2011 after he completed his rotations.

10.     Federal and state courts across the United States have examined the relationship between students and institutions of higher learning/professional schools and have universally found that there is a contractual relationship between the two. This is particularly true when the institution is not publicly, but rather privately funded. Under such circumstances not only is the student-university relationship contractual in nature but the terms of the contract may be derived from a student handbook, catalog, or other statement of university policy. It is also generally accepted that the portion of the

contract that that applies to graduation are the terms in place at the time the student enrolled. In other words, when a student is admitted to a private university there is an implied contract that if the student complies with the terms prescribed by the university that he or she will receive a degree.

11.     While it is implicit in the student's contract with the university upon his or her matriculation that the student agrees to comply with the university's rules and regulations, an academic institution does not have an unfettered liberty to modify its graduation requirements well into a student's course of study. Thus, while the university is entitled to modify its graduation requirements, such a modification must be in the proper exercise of its educational responsibility.

12.     While the university's general contract with its students implies a right to change the university's academic degree requirements, such changes cannot be arbitrary or capricious. Plaintiff examined the conduct of SMU within the context of the existing law prior to filing his complaint. Plaintiff could find no fact scenario as egregious as the one instituted by SMU. In this instance the Board changes did not come "midstream," but literally at the end of Plaintiff's academic journey through SMU. Unlike the body of law that exists on this issue, SMU's actions would seem to be arbitrary and capricious conduct in its most pristine form:

a.     An examination of the only policy statement regarding the change states: "Going forward, the school will similarly require passing scores on the USMLE Step 2 Clinical Knowledge and Step 2 Clinical Skills as a requirement for graduation...The new graduation requirement will apply to those students whose projected graduation falls on or after August 15, 2010 [sic] Students will have up to 12 months after the completion of their clinical rotation to satisfy this requirement. Failure to successfully complete this requirement with the required timeframe...will result in the withdrawal from the University's M.D. program." There is literally no statement of policy that even attempts to draw a nexus between this radical change in graduation requirements and the proper

exercise of its educational responsibility. Nor is their any policy statement in the 2011 catalog where the change first appears outside the May 6, 2010 E-mail.

b.      Plaintiff had to satisfy this arbitrary and capricious requirement or lose over $100,000 in tuition of which over $86,000 had been paid at the time the change was made. In addition, Plaintiff has lost all of the $150,000 in living expenses required to attend medical school.

c.      Unlike the fact scenarios that dominate this area, this change did not come with four years notice, or even one years notice, in other words with some warning of what was to come that would have allowed the Plaintiff to graduate under the prior requirements that were in place when he enrolled. Instead the change was virtually immediate because only persons graduating on May 1, 2010, the same month the change was announced, would be unaffected. The next graduation date was August 20, 2010.

d.      In addition to being immediate, had the new requirement been consistent with those that have been upheld by the courts, only Plaintiff's failure to have met the existing requirements would have equitably justified the imposition of the new requirements. In many of the situations construed by the courts the Plaintiff failed classes or ceased to make basic academic progress that would have allowed the student to have completed his studies so as to graduate under the previous requirements. In this case Plaintiff was not dilatory in any respect. When the requirements were imposed it was physically impossible for him to complete his clinical rotation so as to graduate before August 15, 2010. His completion of his rotations in April 2011 was on schedule and would have allowed him to graduate in May 2011. Had this requirement not been imposed he would have finished even earlier, having taken two months leave from clinical rotations to study for the Step 2 CK exam. Had that been the case his clinical rotations would have ended in late February 2011 making graduation in May 2011 a certainty.

13.      The inadequate notice to the SMU students, including Kidwai, and suddenness of the change becomes both more puzzling and more egregious when considered in the context of what SMU was legally required to do. SMU accrediting agency is the Accrediting Commission on Colleges of Medicine (ACCM). According to its web-site the ACCM is responsible for accrediting medical schools on St Maarten, the Cayman Islands, Nevis, and Saba. The ACCM is in turn recognized as a legitimate accrediting agency by the United States Department of Labor and is therefore required to comply with 34 CFR 602 et. seq.

14.    SMU received its accreditation from ACCM in 2007, about the time that Plaintiff enrolled. Its accreditation is valid through 2013. As part of its accreditation SMU is required to comply with ACCM's "Guidelines for Accreditation." Those guidelines were last amended and presented to the United States Department of Education in 2009. Among other things, the Guidelines require SMU to provide notice to ACCM when SMU makes a substantive change in its curriculum.   Based on ACCM Guidelines for Accreditation 12.2., changing the curriculum to require passing the USMLE Step 2 is clearly a substantive change and under the guidelines SMU had to provide notice to ACCM. This would have been particularly important because until of May 27, 2011, passing the Step 2 exam was not a graduation or curriculum requirement for any medical school accredited by the ACCM. Therefore, SMU was under not compulsion as a matter of accreditation compliance to change the graduation requirement.

15.    The larger question is why, if SMU had to notify its accrediting agency of the change in curriculum, that is was unreasonable or unnecessary to notify its student body prior to the change?  Plaintiff believes that the ACCM Guidelines clearly articulate an intent to benefit the student, both in broad terms and in the specific requirements such as notice. Plaintiff has no idea when the ACCM was notified, or if in fact it was notified at all prior to the change. ACCM complies with 34 CFR 602.22 (a) (2) by requiring notice of changes to the curriculum. The purpose of the notice requirements by SMU to ACCM is in part to ensure that a radical change that affects students does not occur without prior knowledge. If SMU could provide notice to ACCM, it should have provided notice to SMU's student body. Because ACCM did not require the Step 2 Exam until after May 27, 2011, there was no compelling reason to make the requirement immediately

applicable to Plaintiff. Had SMU merely followed the lead of its own accrediting agency Plaintiff would have already graduated before the USMLE Step 2 requirement was ever mandated.

16.     The ACCM Guidelines provide substantive proof as to the prejudicial nature of the change in graduation requirements in May 2010. Section 6.3. of the ACCM guidelines forbids SMU or any medical school on St Maarten, Nevis or Saba from accepting transfer students after they have completed two years. The ACCM requirement is consistent with schools throughout the Caribbean and as stated in paragraph 8 herein, a transfer in May 2010 was impossible. As set out herein above, SMU had taken virtually all of Plaintiff's tuition by May 2010, applied a graduation requirement that was not in place when he matriculated or at any time thereafter, and has now used that requirement to involuntarily dismissed him. All of this was done under circumstances where its accreditation requirements did not require passing the USMLE Step 2 exam and the USMLE was not a requirement for graduation when Plaintiff matriculated in January 2007.

17.     Based upon information and belief and as set out herein above, SMU's modification to its graduation requirements was completely unconnected to any educational responsibility. SMU is a private, for-profit institution. Shortly after Plaintiff enrolled, SMU lost the ability to provide any non-scholarship financial aid. The non-U.S. medical school market is very competitive. Plaintiff believes that SMU's change in policy and the virtual immediate effective date of the change was to somehow secure the ability to provide financial aid. The sudden policy change seems to be designed to make SMU more attractive to potential students who unlike the Plaintiff do not have the

resources to self-finance their medical education. When Plaintiff pressed SMU's chancellor, John Marvin as to why this policy was being so unfairly applied with such an immediate effect, he was told "I understand your concern. I would probably feel the same way if I was in your shoes, but this is something the Board has been considering for a while." The fact the Board had been contemplating such a change and did not provide any reasonable warning or notice adds to the arbitrary and capricious nature of the change.

18.     Effective in April 2012 Plaintiff was involuntarily withdrawn from SMU. Contrary to the ACCM Element of Accreditation 6.5 under which SMU operated, there were no polices in place, faculty committee, or due process procedures wherein Plaintiff could have appealed the decision to dismiss him.   He has now lost over $250,000 and has no degree.  He has applied for jobs where a medical license is not a requirement. However, a diploma indicating graduation from a medical school is a necessity and Plaintiff cannot provide one. Plaintiff faces the possibility that he can never obtain a medical degree. He has completed everything that was necessary for graduation and now has been dismissed from the SMU program. Furthermore Plaintiff cannot reapply to any other medical school with any real expectation of being accepted.  Most, if not all medical schools ask applicants if they have ever been enrolled in medical school before. An answer of "yes" for being withdrawn or dismissed virtually eliminates an applicant from any consideration.

19.     Not only are the Defendants obligated to issue his diploma, but failing to do so they owe Plaintiff for the cost of obtaining his degree and the income he would have earned had he received just a diploma.  The last job for which Plaintiff was a viable

candidate was in Los Angeles, California and would have paid him an entry-level salary of $36,000. Had SMU not instituted the new graduation requirement Plaintiff would have graduated in April or May of 2011. During the 10-month period from when he should have graduated up to the present, Plaintiff has declined employment offers because he could not provide proof he had graduated from medical school.

### IV. First Cause of Action: Breach of Contract Against SMU

Plaintiff incorporates paragraphs 1-19 as if fully set out herein below, and in addition would plead as follows:

20.     Plaintiff had a valid and existing contract with the Defendant SMU.  He completed all conditions precedent to the realization of the benefits of that contract, specifically all requirements for graduation that were in place when he enrolled. In addition, those same requirements appeared in the course catalog every year he was at SMU through the 2009-2010. The actions of SMU whereby it arbitrarily and capriciously changed its graduation requirements less than twelve months before Plaintiff was to complete his education and then applied the changes to alter the requirements that existed when he enrolled constitutes a breach of the contract.

21.     As set out hereinabove, Plaintiff has been damaged by this breach. He does not have a diploma and is therefore precluded from seeking jobs that require a medical degree.  He has expended over $250,000 in tuition, fees and living expenses in order to obtain is M.D. His dismissal from SMU results in Plaintiff being unable to every reapply with any reasonable hope of acceptance, even if he had the resources to repeat what was a four-year ordeal.  As such, Plaintiff is entitled to damages equal to what he would have earned had his diploma been issued consistent with the requirements that existed when he

enrolled. In addition and in the alternative he is entitled to specific performance of the contract and the granting of his diploma.

### V. Second Cause of Action: Unjust Enrichment Against SMU

Plaintiff incorporates paragraphs 1-19 as if fully set out herein below, and in addition and/or in the alternative would plead as follows:

22.     The elements of a claim for unjust enrichment are:

a. plaintiff has conferred a benefit on the defendant, who has knowledge thereof;

b. defendant voluntarily accepts and retains the benefit conferred; and

c. the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.

It is clear the Plaintiff has paid over $100,000 in tuition and fees to the Defendant SMU and that SMU accepted that money. As set out herein above, not only is it a breach of the contract between SMU and Plaintiff, but to allow SMU to keep Plaintiff's tuition and fees would be inequitable.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein and that upon trial on the merits that Plaintiff be awarded judgment as follows:

1.     For specific performance of the contract resulting in the awarding of his diploma;

2.     In addition, or in the alternative for monetary damages for what Plaintiff expended to attend SMU;

3.     For monetary damages for loss of current employment opportunities occasioned by the failure to grant Plaintiff's diploma;

4.     For monetary damages for loss of future employment resulting from the failure to obtain a diploma;

5.     For monetary damages for unjust enrichment;

6.     For attorney's fees for breach of contract;

7.     For costs of court, pre and post judgment interest at the maximum rate allowed by law;

8.     For any and all other relief at law or in equity to which the Plaintiff shows himself entitled.

Respectfully Submitted,

Mark A. Weitz
TX SB# 21116500
FL SB#0779512
Weitz Morgan PLLC
100 Congress Avenue, Suite 2000
Austin, Texas 78701
512-394-8950 (direct)
512-657-1849 (mobile)
512-852-4446 (facsimile)
ATTORNEY FOR PLAINTIFF
MARAJ KIDWAI

Plaintiff Requests Trial By Jury