IN THE DISTRICT COURT OF UNITED STATES
THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARAJ KIDWAI,                              CASE NO. 6-12-CV-01061-RBD-GJK

       PLAINTIFF,

v.

ST. MATTHEW'S UNIVERSITY
SCHOOL OF MEDICINE, AND
THE BOARD OF TRUSTEES OF
ST. MATTHEW'S UNIVERSITY
SCHOOL OF MEDICINE,

       DEFENDANTS.
_____/

## FIRST AMENDED COMPLAINT

With the Court's permission, Plaintiff Maraj Kidwai hereby files his First Complaint for legal and equitable relief, and in support of the various claims asserted herein, alleges as follows:

### Nature of the Action

1.    In this Complaint, Plaintiff seeks both legal and equitable relief - including, but not limited to, monetary damages and specific performance for breach of contract; and/or compensatory damages and for contract rescission (or reformation) for the various acts of fraud and misrepresentation committed by the Defendants here in inducing the Plaintiff to seek admission and matriculate at the Defendant School, and to remain matriculated at same – at all times material thereto expending substantial funds to continue his progress to the monies.

2.    This action is _not_ a simple "breach of contract" claim asserted by a disgruntled student over a "grade" or other academic decision, or his school's "failure to promote him," or is it in fact any claim concerning a school's authority, as professional educators to *evaluate* a student's academic performance.

3.      This lawsuit, while in *part* grounded in contract, also seeks to raise several substantive actions in tort, the nature and consequence of which (upon motion and appropriate hearing) will very likely give rise to claims for punitive damages (i.e., in addition to compensatory damages and various forms of equitable relief).

4.      This action, and more particularly, the "breach of contract" component of same, is not primarily directed not at any "academic" decision made by the school, but is instead directed at a wrongful attempt by the school to unilaterally alter the terms of the contract between itself and Plaintiff in such a way to cause the Plaintiff to incur substantial damages and unjustified forfeiture.

5.      This action, and more particularly, the "breach of contract" component of same, is also directed at the ongoing bad faith and wrongful conduct of the Defendant School in refusing to resolve this dispute by simply honoring the contract it made with the Plaintiff, or at the very least - returning all of the consideration it had been paid by Plaintiff in the over four (4) years he attended and paid tuition and fees.

6.      In this action Plaintiff asserts that the defendant "medical school" is essentially a "predatory" educational entity, its operative intent being to defraud and essentially extort money out of wealthy (or federally-funded) students (many from the United States) and then "involuntarily dismiss" large numbers of them after it has siphoned off all their funds.

7.      The "corporate name" of the Defendant School appears deceptive (i.e., "St. Mathews University"), as this action is actually directed at a very small privately-owned "school" (with less than 500 students) that simply *markets and advertises to itself* to potential students as a "Medical University" by title - but in reality, is barely the size of small high schools today.

8.     "Saint" Mathews has no apparent affiliation to <u>any</u> organized religion and the reference to a "Saint" is therefore utilized as a marketing tool.

9.     The Defendant is a "for profit" "school" which is run by as many five (5) different corporate entities; has its first year class studying "off shore" in the Cayman Islands (with no substantial campus in the U.S.), and administrates from Orlando, Florida; and has its "fiscal" and "legal" offices in Massachusetts. The two Defendants named are the only ones identified, based on the specific representations of defendant's counsel that these entities are the only proper defendants in this case.

10.     This action is directed at Defendant which a) markets itself internationally (i.e., on the internet) as some sort of "Medical <u>University</u>" but in reality, enrolls only a handful students each year; and which is essentially b) an "off-shore" entity that is at least partially located and operated in the Cayman Islands; and which c) purports to be a "medical school," yet confers a degree upon its students which numerous jurisdictions *do not even recognize as a valid for licensure* in professional medicine.

11.     This is a lawsuit directed at a corporate entity that is established behind numerous "parent" (on information and belief "shell") corporations in what appears to be an obvious attempt to shield itself from lawsuits brought by the students, like the Plaintiff, whom it has ostensibly defrauded.

12.     This lawsuit is intended:

a) to judicially force the Defendant School to confer upon Plaintiff the degree he earned, without having to take and pass the Step 2 CK Exam;

b) to ensure that the Plaintiff is fully compensated for any and all reasonably foreseeable damages (including non-speculative consequential damages) that he incurred as a result of the Defendant School's wrongful acts (i.e., as detailed with greater particularity below);

c) to encourage any <u>other</u> students who have been similarly mistreated by the Defendant School to come forward and sue the Defendant School as well;

d) to put potential students on notice of Plaintiff's claims here, perhaps encouraging them to conduct substantial due diligence regarding the Defendant School before considering applying or committing any money towards enrollment;

e) to encourage the Defendant School to comply with the terms of its own contractual agreement with the Plaintiff (and others similarly situated);

f) to properly inform members of the public, the U.S. Government, and any appropriate accrediting agencies, of the School's wrongful practices and policies; and

g) if the Court deems it appropriate under Florida and federal law, upon proper motion and hearing, to allow leave to amend to make a claim for punitive damages.

13.     The Plaintiff, a former student at the Defendant "University," in order to achieve the goals set out in Paragraphs 2-11 above, hereby files this Amended Complaint.

## The Parties

14.     Plaintiff Maraj Kidwai is a U.S. citizen and resident of the State of Texas, and is otherwise *sui juris*.

15.      Defendant "St. Matthews University School of Medicine, Ltd. (Cayman) Corp. (hereinafter referred to as the Defendant," or the "Defendant School," or simply "SMU") is a foreign (Cayman) for-profit corporation formally registered to do business in the State of Florida with the Florida Department of State, and is in fact doing business here in the State of Florida as "St. Matthews University School of Medicine."

16.      The Defendant "Board of Trustees of St. Matthews University School of Medicine, Ltd. (hereinafter referred to as the "Defendant Trustees"), comprises the Board which makes many of the operational decisions related to the action set forth in this complaint.

## Allegations Establishing Jurisdiction and Venue

17.     This Court has subject matter jurisdiction over this matter because pursuant to the provisions of 28 U.S.C.A §1332, complete diversity of citizenship exists between the Plaintiff and all Defendants named herein, as described with greater particularity in Paragraphs 2, 3 and above; and the amount in controversy far exceeds the jurisdictional minimum of $75,000.00, as the damages here are  reasonably contemplated to be in the millions of dollars (note: this estimate does included any potential award of punitive damages, which, in light of the wrongful and intentional conduct alleged to have been committed by Defendants here, Plaintiff's anticipates seeking same; but only when appropriate, and on proper motion to the Court)

18.     This court has *in personam* and personal jurisdiction over the Parties because:

    a.  As alleged with greater specificity below, the Plaintiff has incurred substantial damages in the state of Florida, as a result of the wrongful conduct committed by the Defendants in this State; as a result Plaintiff has filed suit in this jurisdiction, voluntarily submitting himself to the jurisdiction of this court;

    b.  As alleged above, and with greater specificity below, The Defendants own and operate a business in Florida, and more specifically, the Defendant School owns and operates the very business in Florida that committed most, if not all of the wrongful acts (both tortious and contractual) alleged to have been committed by the Defendant in this Complaint;

    c.  The Defendant School actively recruited the Plaintiff (i.e., as a student), and arranged his admission and matriculation - *via* the internet and United States mail – created and sent from its agents and employees operating from, and located in, its administrative offices - located in Orlando, Florida, and within this Court's jurisdiction;

    d.  The Defendant failed to perform a contract obligation due in this jurisdiction, and more specifically, Defendant materially breached the parties' Contract by failing to confer the medical degree the Plaintiff earned upon his successful completion of the requirements set out in said Contract, said failure of performance occurring here, in the state of Florida, and within this Court's Jurisdiction;

    e.  The Defendant School  has actively engaged in attempts to settle and litigate this matter in this jurisdiction, thereby voluntary subjecting itself to this Court's authority by:

1.  offering initially to settle the matter, pursuit, with the Plaintiff's Florida lawyer (i.e., by allowing the Plaintiff to take the Step 2 exam);

2.  requesting and moving for *pro hac vice* status with no limitation on jurisdiction; and

3.  affirmatively filing documents with this Court (e.g., its "Certificate of Interested Parties" and its "Answer and Affirmative Defenses;" and

4.  negotiating a date with Plaintiff's Texas counsel for a Case Management Conference pursuant to Local Rule 3.05, and then rescheduling and conducting said Conference with Plaintiff's current counsel.

19.     The Court's exercise of jurisdiction over the parties to resolve Plaintiff's Claim would be both fair and appropriate in light of the facts and circumstances described in greater detail herein.

20.     Both parties have waived appropriate service of process.

21.     Venue is appropriate in this District pursuant to 28 USCA §1391 (a) (2) and (3) (c) and (d), in that a substantial part of the facts giving rise to the Plaintiff's claims arose within this Court's Jurisdiction, and because the operations, numerous responsible parties, and the Defendant School itself, can be found in, and are subject to, this Court's *in personam* jurisdiction.

## General Allegations Common to All Counts

22.     Prior to January 2007, Plaintiff was enrolled as medical school student at "St. George's Medical School in Grenada," and was successfully progressing towards a medical degree.

23.     In looking for an appropriate medical school to which to transfer, the Plaintiff researched potential medical schools on the internet, where he discovered the Defendant

School's Website (hereinafter referred to as "the Website"; and accessible at http://stmatthews.edu/)

24.     On its Website, the Defendant School  made numerous representations of fact to the Plaintiff, quite obviously intending to use those representations to <u>induce</u> students like Plaintiff to inquire, and perhaps <u>apply</u> there (*i.e.*, and if so, eventually pay substantial amounts of money in "tuition" and "fees") to the School; such representations, including, but are not limited to the following:

    a.  The Defendant School  represented that its students' pass rate on the USMLE Step I Exam was "above 90%," and was "on parity" with students from U.S. medical schools, and "far above the average level of students from other non-U.S. schools [61%];"

    b.  The Defendant School represented to Plaintiff (*through its Co-Defendant Trustees*) that it would "ensure that members of the Faculty were qualified for their appointment;"

    c.  The Defendant School represented to Plaintiff (*through its Co-Defendant Trustees*) that it would "ensure that members of the Faculty were…able to competently perform their function" and were properly credentialed to teach the course to which they were assigned;

    d.  The Defendant School represented to Plaintiff that it was an "expert" in the financial aid process" and that "both loan and scholarship programs were available to assist [him] you in funding the full cost of [his] education;"

    e.  The  Defendant School  represented (*via* conspicuous <u>omission</u>) that the graduation requirements for the medical degree the Plaintiff was seeking *did not include* taking and passing the USMLE Step 2 Exam;

    f.  The Defendant School represented that it was in full compliance with the Guidelines set out by its accrediting agency, ACCM.

    g.  The Defendant School has made numerous other representations or "shady" marketing techniques, such as:

        1.  Referring to itself as "University," when in reality it is barely the size of a small high school;

2. Utilizing the acronym "SMU" in an almost too-obvious attempt to confuse potential students into thinking the School is Affiliated with "Southern Methodist University."

25.     Each of various representations made by the Defendant School to potential students on its Website (and elsewhere, as alleged in greater particularity herein), and including those described in Paragraph 25 above made to Plaintiff (hereinafter referred to collectively as "the Misrepresentations") were: a) false, misleading, inaccurate, and/or untrue; and b) at the time they were made by Defendant School to the Plaintiff, the Defendant School either knew, or should have known them to be, false and inaccurate.

26.     The Misrepresentations made by the Defendant School on its Website and elsewhere were of the nature and type any reasonable person, looking for data or information regarding a University's degree requirements, would reasonably rely on as being truthful and accurate.

27.     The Misrepresentations made by the Defendant School on its Website and elsewhere were in fact *material* to Plaintiff's decision to seek admission and degree at the Defendant School.

28.      The Plaintiff *reasonably relied* on the Misrepresentations made by the Defendant School when deciding to seek admission and matriculate toward a medical degree.

29.     In reasonable and justifiable reliance on the Defendant School's Misrepresentations, on or about December 2006, the Plaintiff officially transferred from St. George's Medical School in Grenada to Defendant School, matriculating as a degree-seeking medical student; with an anticipated graduation date of May 2011

30.     Upon his admission and matriculation at the Defendant School in January 2007, the University provided the Plaintiff with a *University Catalogue* (hereinafter, "the *Catalogue*"

or the "*School Catalogue*") in which it expressly identified the various requirements and conditions, the completion of which, would entitle him to a degree.  A copy of the University Catalogue is attached hereto as **"Exhibit A**" and is incorporated herein by reference.

31.    Not surprisingly, this "hard" copy of the "*Catalogue*" contained the very same content and misrepresentations contained in the *University Catalogue* that the Defendant School had previously made available to the Plaintiff on-line at the Defendant School's Website.

32.    Upon his admission and matriculation at the Defendant School in January 2007, the Plaintiff reposed all trust and confidence in the Defendant School, and more specifically, the Defendant Board of Trustees, and the Defendant School and Trustees accepted that responsibility of trust and confidence – in exchange for substantial consideration, in the form of Plaintiff's commitment of time, his academic labor – and the considerable amounts of money he paid to the Defendants in tuition and fees and other charges.

33.    According to the *School Catalogue,* at all times material hereto, the various duties owed by the Defendant Board of Trustees (i.e., to <u>students</u> like Plaintiff) included, but were not limited to:

     a.  "ensure that the rules and regulation of the University [met] the highest levels of propriety;"

     b.  "ensure that members of the faculty [were] qualified for appointment and they [were] able competently to perform their function;" and

     c.  "exercise supervision of the needs of the student body and recommend steps to make provision for the welfare of the students and the successful pursuit of their studies."

34.    According to the *School Catalogue,* the primary purpose of the Defendant Board of Trustees was to "provide *supervisory machinery* independent of management" clearly

indicating that the "supervision" of the Defendant School was in the hands of its three named Trustees (*i.e.*, Defendants here).

35.     Contrary to any assertion the Defendant School might make, the Defendant did not provide a copy of any purported "handbook" - either prior to seeking admission, on admission, or shortly thereafter.

36.     As relevant to the various causes of action raised herein, and in the interests of full disclosure, Plaintiff will acknowledge that at some point in time <u>after</u> the Plaintiff's anticipated graduation date, Plaintiff was able to secure a copy of a 2010 "handbook."

37.     It is significant to note, for all counts asserted herein, that at all times material hereto, the Defendant School's <u>Website</u> - while it includes the *School Catalogue* - does not contain – nor even <u>refer</u> to - any "handbook" or student handbook (although the Catalogue itself does refer to a "handbook" in a handful of places).

38.     Thus, while the Defendant School is expected to claim that it purportedly created some sort of "Student Handbook" controls the Parties Contract here, the fact is Plaintiff <u>never received</u> any such "Student Handbook" prior to his admission, or upon his admission, or during his matriculation, or even upon his request, and had no idea of what it might have been, or not been, inside of same.

39.     The various degree requirements and conditions identified in the *School Catalogue* were essentially the <u>same </u>as those represented by the Defendant School on its internet Website, and were essentially the same as those Plaintiff had relied on in deciding to seek admission and matriculate towards a degree at the Defendant School, thus confirming for Plaintiff (upon his reasonable reliance) what he believe the terms of the parties' Contract.

40.     More specifically, and as pertinent to the allegations of fact contained above, the degree requirements and conditions of graduation contained in the Defendant School's *Catalogue*, as mandated by the Defendant Board of Trustees, <u>did not require</u> Plaintiff and the other members of his class to pass the Clinical Skills (CS) and Clinical Knowledge (CK) portions of United States Medical Licensing Examination (USMLE) Step 2 Exam (hereinafter referred to the "Step 2 Exam").

41.     These <u>same</u> Graduation Requirements and conditions (i.e., that <u>did not require</u> the Plaintiff to take and pass the Step 2 Exam) appeared <u>every year</u> in the <u>new</u> edition of the School Catalogue - year-in, and year-out – with no change - for virtually the <u>entire time</u> Plaintiff remained a student at (and paid tuition to) the Defendant School.

42.     In point of fact, Plaintiff's Degree Requirements remained virtually <u>unchanged</u> for over three (3) years – during which time Plaintiff paid almost 90% of his tuition, and completed almost 80% his studies - until such time that Plaintiff had already commenced  his <u>last year</u> of study.

43.     More specifically, on or about May 2010, while Plaintiff was in the process of completing his <u>fourth</u> and <u>final</u> year of study at the Defendant School, having successfully completed over 50% of his final clinical rotations (*i.e.*, the very <u>last</u> remaining substantive requirement prior to his anticipated graduation); at that current pace, Plaintiff quite reasonably anticipated graduating and receiving his earned degree from the Defendant School with his earned medical degree - after almost 4 years of hard work and almost $300,000 in expenses – on or before <u>April</u> <u>2011</u>, less than one year away.

44.     For the duration of Plaintiff's tenure at the Defendant School, Plaintiff was a model student: he failed not one course, always received passing-to-exemplary grades, and

received excellent evaluations from his teachers; indeed, Plaintiff progressed through the various stages of matriculation without one negative incident on his record whatsoever; and in early May of 2010 - there was literally no impediment to his imminent graduation in just about 11 months.

45.     However, in May of 2010, with Plaintiff less than a year from graduation, and without any prior notice or indication whatsoever, the Defendant Board of Trustees and the Defendant School sent Plaintiff an e-mail in which the School purported to effect a unilateral "change" in his Degree Requirements - <u>adding</u> two (2) <u>new</u> mandatory, substantive requirements - that he 1) take and 2) pass the USMLE Step 2 Exam (within a certain time frame and under a very specific protocol).

46.     Plaintiff was also informed by the Defendant Board of Trustees and the Defendant School that he would have to comply with these newly implemented Graduation Requirements – or would not be permitted to graduate and get the degree he had earned (*i.e.*, pursuant to the terms and conditions set out in the *School Catalogue,* the same terms and conditions upon which Plaintiff had relied, and under which Plaintiff had labored so hard, to his economic detriment, for almost 4 years).

47.     More specifically, in an e-mail transmission to Plaintiff, the Defendant Trustees and Defendant School notified the Plaintiff that they had decided to unilaterally alter the Plaintiff's Graduation Requirements so as to add the <u>new</u> Degree Requirements – that, in addition to the Graduation requirements the parties had originally agreed to in their Contract, Plaintiff would now be required to both take and pass the USMLE Step 2 Exam (hereinafter, the "Change").  A copy of the "notice" that the Defendant School sent to the Plaintiff (hereinafter referred to as "the Notice of Change") is attached hereto as **"Exhibit B"** and is incorporated herein by reference.

48.     In this purported "Notice of Change," the Defendant School  abruptly announced to the  Plaintiff - who, at this point in time had completed more than 75% of  his degree requirements (and paid nearly 100% of his tuition) – a penalty as well - that this newly implemented degree requirement had to be satisfied, or he would be "involuntarily withdrawn" from the degree program and forced by the Defendant School to forfeit the medical degree – that same medical degree that the Defendant School had previously promised to award him (i.e., without his having to take and pass the Step 2 Exam) and which he had anticipated receiving *in less than one year's time.*

49.     Plaintiff was informed by the Defendant School in its "Notice" that he had no alternative whatsoever but to agree to take the Step 2 Exam and pass it within one year from the date he finished his clinical rotations  (i.e., over a maximum of three tries); and that if he did not pass the Exam, the University would involuntarily drop him from the four (4) year program (of which that he had completed more than 3 years) because he failed to satisfy that one (i.e., improperly implemented) Degree Requirement.

50.     After receiving the Notice, and upon researching the possibility of immediately *transferring* to one of the numerous medical schools that did not require degree-seeking students to pass the Step 2 Exam, the Plaintiff discovered that the timing of the Notice (i.e., in terms of the Plaintiff  advanced  progress in the medical degree program) left him with no chance to transfer to another medical school; more specifically, had the Defendant School provided the Plaintiff with Notice of the change months earlier - or even informed him that it was contemplating such change, he could have transferred to another medical school with little difficulty or expense.

51.     At the time the Defendant School imposed the Change on the Plaintiff, the Plaintiff had completed 100 % of his required coursework at the Defendant School, and 75% of his Clinical Rotations (the last requirement for a degree); Plaintiff was 11 months shy of graduation, and had paid the Defendant more than 90% of the total tuition due for his degree program.

52.     Plaintiff thoroughly satisfied the graduation requirements that were in place when he enrolled and matriculated at the Defendant School, said requirements remaining in place and unchanged for more than 75% Plaintiff's academic progress.

53.     As a sign of good faith, and in a genuine attempt to comply with what was an obviously unjustified demand and a material breach of the parties Contract, Plaintiff prepared as best he could under the circumstances, attempted the two parts of the step 2 Exam, passing the "CS" Portion of the Exam in of 2011; however, Plaintiff was not able to take and pass the "CK" Portion of the Exam within the strict timing /mandatory requirements set out in the Defendant School's Notice of Change.

54.     The Plaintiff completed his final clinical rotation on or about April 2011 and should have graduated and received his degree from the Defendant School no later than May, 2011.

55.     The Plaintiff requested, then demanded his degree (i.e., without having to pass the Step 2 Exam) from the Defendant School, but the School has refused to perform its obligation under the Parties' Contract.

56.     At the graduation and degree-awarding ceremony, which the Defendant School holds in Orlando, Florida, the Defendant School did not confer the degree on Plaintiff that he had earned under the Parties' Contract, and as of the filing of this Amended Complaint, the

Defendant School, through its administrative offices located in Orlando, Florida, and its legal counsel located in the State of Massachusetts, has refused to perform in accordance with the terms of the Parties' Contract.

## COUNT I:  BREACH OF CONTRACT AS AGAINST THE DEFENDANT SCHOOL

57.     All facts alleged above are realleged and reaverred in this Count I as is fully set out herein.

58.     The Plaintiff and the Defendant School entered into a valid, enforceable contract (as identified and alleged above, and used herein, "the Contract").

59.     Pursuant to well-established Florida Law, the terms and conditions of the parties Contract are essentially set out in the *School Catalogue* that the Plaintiff relied on in making his application, and which the Defendant School provided to the Plaintiff upon his admission and matriculation, said terms and conditions being described with greater particularity above, with said *Catalogue* be attached hereto as Exhibit A.

60.     The clear and unambiguous terms and conditions of the parties' Catalogue/Contract *do not require the Plaintiff to take or pass the Step 2 Exam* in order to be entitled to the degree he earned pursuant to those terms and the conditions.

61.     Although counsel for the Defendant School has claimed in a letter that a purported "student handbook" from 2007 exists, and that this purported "student handbook" contains a critical provision – not contained in the *School Catalogue* - that (counsel claims) permits the Defendant School to change the Plaintiff   Degree requirements, in *direct contradiction to the   Parties' Contract*; the fact is, the Plaintiff categorically <u>denies</u> ever receiving or even <u>seeing</u> any such a handbook prior to, or during, the 3+ years he attended the Defendant School (i.e., the purported "handbook" was not on the School's website; was not

visible or available <u>anywhere</u> on the School's "campus" on the Cayman Islands, and the Plaintiff never did see this alleged "handbook" in the possession of any other student at the Defendant School with whom he was acquainted, and was in no way made aware that the so-called handbook did in fact exist).

62.     More specifically, for purpose of this Complaint:

a) the Plaintiff affirmatively and categorically <u>denies</u> receiving any such handbook from the Defendant School, nor  even <u>seeing</u> any such handbook, much less a provision such as the one to which Counsel refers, either prior to seeking admission or during his time at the school;

b) there is, of course, *no mention* in the *School Catalogue* of the <u>critical</u> provision upon which Defendant School's counsel relies on in his letter; while speculative, of course, it is undeniably a material fact that a provision - so critical to the Defendant School's position here – does not also appear in the alleged "handbook" nor online on the school's Website where it "fishes" for new potential students; in other words, a potential student, seeking information as to what will be required to earn a degree at the Defendant School - will likely rely on the materials posted (i.e., including the School Catalogue) on the Website, and other materials the Defendant School makes readily accessible;

c) the fact is, if some purported student "handbook" contained such a critically important provision – a provision that gave the Defendant School the right to materially and substantially alter matriculated students' Degree Requirements, that critical provision would (and should) also have be included in the University Catalogue, and posted on the School Website;

d) a review of the extensive list documents available for download on the Defendant School's Website (while it of course provides access to the *School Catalogue*) does not list nor mention anywhere a "Student Handbook;"

e)   the Plaintiff  is confident that the  Defendant School can produce absolutely no evidence or proof to establish that the purported "handbook" was ever provided to the Plaintiff, nor that it ever became a part of a part of the Parties' Contract; and

f) the Defendant School's *after-the-fact* claim that there was some sort of "Student Handbook" (i.e., which granted the Defendant School the right to "change" the Plaintiff's Degree Requirements at will) is unsubstantiated, unproven, and is nothing more than yet another act of bad faith committed by the Defendant School in this matter.

g) Moreover, even if such a provision did in fact exist in the Parties' Contract, under common law contract principles applicable in the State of Florida, such a *unfettered* right would of course be <u>unenforceable</u>, as it would render the Defendant's obligations arising said Contract "illusory," and because any material change would most certainly require good faith on the part of the University, the assent of the Plaintiff, <u>and</u> new consideration, none of which do not exist here; as such a provision would either be *void ab initio*, or at the very least, would *not enforceable as written.*

63.     Whatever the validity or efficacy of any "right to change" provision contained in the purported handbook, the same Graduation Requirements that induced the Plaintiff to attend the Defendant School (*i.e.*, and that did <u>not</u> require him to take and pass the Step 2 Exam) remained the exact same - <u>unchanged</u> and in place – in the *School Catalogue* every single year from the date of the Plaintiff's admission and matriculation from late 2006/early 2007 until May 2010,  just 11 months short of Plaintiff's anticipated graduation date from the Defendant School (approximately 40 of the 51 months Plaintiff actually attended the Defendant School).

64.     In the nearly four (4) years that the Plaintiff attended the Defendant School and worked towards his degree (i.e., in strict accordance with, and in reasonable reliance on the Requirements and Conditions for Graduation set out in the *Catalogue* and Parties' Contract) the Defendant School did *not notify the Plaintiff nor any other students* that its Board of Trustees was in fact *actively contemplating and discussing a substantive change in his degree requirements.*

65.     The Defendant School's Trustees' *unnecessarily secretive* promulgation of the new Degree Requirement, and its academically and logistically *abrupt implementation* of the Change, together constituted *a failure to exercise "good faith"* (i.e., in exercising <u>whatever</u> discretionary authority the Defendant Board <u>may</u> have had to effect such a change under any "right to change" provision contained in any alleged handbook).

66.     The Defendant School's attempt to unilaterally change the Plaintiff's Graduation Requirements (i.e., requiring Plaintiff to take and pass the Step 2 Exam) constituted a material alteration of the Parties' Contract.

67.     The Defendant School's attempt to unilaterally change the Plaintiff's Graduation Requirements (i.e., requiring Plaintiff to take and pass the Step 2 Exam) was neither a) supported by additional consideration; nor b) mutually assented to by Plaintiff.

68.     The Defendant School's unilateral Change of Plaintiff's Graduation Requirements (i.e., requiring Plaintiff to take and pass the Step 2 Exam) constituted a "substantial departure" from its curriculum and degree requirements without justification or adequate notice to the appropriate parties, such as its Accrediting Agency, ACCM.

69.     The Defendant School's delivery to the Plaintiff of its "Notice of Change" to his Degree Requirements constituted an unequivocal statement by Defendant Board of Trustees and Defendant School of the Defendants' intention to refuse to honor and perform the School's contractual promise to Plaintiff (i.e., to award him the degree he earned upon the successful completion of the requirements and conditions set out in the Catalogue he received prior to, and at a matriculation at the School) and a material breach by anticipatory repudiation of the Parties' Contract.

70.     The Defendant School's unilateral Change of the Plaintiff's graduation requirements (i.e., requiring his passing the Step 2 Exam) can be fairly characterized as being "*arbitrary and capricious*" in any  number of ways, including, but not limited to the following:

> a) Defendant's implementation of the Change *so late in the Plaintiff's academic career,* was *arbitrary,* in that Plaintiff was left with *no reasonable alternative,* essentially causing the Plaintiff a substantial forfeiture of all of the work and expense he had put into earning his degree, and without any justification whatsoever;

b) the Defendant School underlined_implemented the Change *arbitrarily and capriciously* - by effectuating the requirement *so late in the Plaintiff's academic career* that it made it *impossible* for Plaintiff *to transfer to another medical program elsewhere* (i.e., to a medical school that did not require its students to pass the Step 2 Exam at that time) so that he might complete his education as he had originally contemplated when he originally entered the Defendant School;

c) the Defendant School implemented the Change *arbitrarily and capriciously*, by making the Change effective almost immediately (*i.e.*, the August 2010 effective date is deceptive, in that the change essentially applied to all currently matriculated students, and did so in spite the fact that the School's only accrediting body, ACCM, had not made the Step 2 Exam a requirement until after May of 2011 (*i.e.,* not for almost another year);

d) the Defendant School implemented the Change *arbitrarily and capriciously*, by making the Change effective almost immediately, when the Defendant could have acted *reasonably* - with no appreciable difference in and not arbitrarily - and provided its fully-matriculated students with the same one (1) year notice that its accrediting had provided to it (i.e., notifying all fully matriculated students of the impending change coming in one year, giving those students (like the Plaintiff here) a reasonable opportunity to opt out and not be forced to forfeit all of the time and money put in expectation of a degree – as was promised in the parties' Contract;

e) the Defendant School implemented the Change *arbitrarily and capriciously*, in failing to include a "grandfather clause," an "opt-out" provision and/or any other meaningful or alternative or exceptions that would allow the school's currently-matriculated students (i.e., particularly those with extenuating circumstances), to avoid the harsh penalty and material forfeitures they would incur if they failed to satisfy this newly-implemented rule (i.e., by failing to take and pass the Exam - an examination *they were specifically not required to pass upon admission and matriculation to the Defendant School);*

f)   the Defendant School implemented the Change *arbitrarily and capriciously;* by including an unreasonably short "grace period" before the actual effective date; which essentially rendered the newly implemented Change in substantive degree requirements effective upon the Plaintiff's receipt of the Notice;

g) the Defendant School implemented the Change *arbitrarily and capriciously;* by choosing an arbitrary effective date for the Change, a date which in essence, *for no discernible logical reason,* essentially established *two (2) separate classes* of currently-matriculated students; one "class" of currently-matriculated students *who did not have to take and pass the Step 2 Exam* (i.e., those able to graduate within the three-month grace period the Notice provided for them);  and a second class of also fully-matriculated students, also progressing toward a degree but – who (unlike the first group) were not graduating as of the alleged 3-month

deadline (which in actually was really just several weeks) – and were thus underline required to take an pass the Step 2 Exam in order to get the degree they had earned;

h) the Defendant Board of Trustees implemented the Change *arbitrarily and capriciously* - by conducting its ongoing discussions an negotiation in secret – and not providing their own currently-matriculated students with *any indication the Change could be (or was) coming;* more specifically, in spite of the fact that for over four years the Plaintiff attended the Defendant School, the Defendant Trustees were in fact carrying on continuing discussions and debates concerning the possibility (indeed, probability) of changing Plaintiff's Degree Requirements – at the proverbial last minute – they gave Plaintiff no hint that the change might be coming (i.e., allowing him a reasonable time to transfer out and seek suitable alternative educational accommodations *elsewhere*);

i) the Defendant School not only implemented the Change *arbitrarily and capriciously*, but did so *in the utmost bad faith,* in that the only reason the Defendant School and Defendant Board of Trustees would, or could, have had for keeping their discussions about the upcoming  Change in Degree Requirements "secret" would be that the Defendant Trustees and Defendant School knew that if they (properly) informed the School's then currently-matriculated students that it intended to impose the sort of Change on them, the Defendant School could lose those students immediately (i.e., and the "income" generated by those students' enrollment) who would transfer out (as would have the Plaintiff) before it was too late to do so; indeed, the Defendant School's unjustifiably "secret" protocol in promulgating a substantial change in Plaintiff's Degree Requirements   itself reveals the totally self-serving nature of the timing and effective date of the degree Change.

j) the Defendant School implemented the Change *capriciously* - by not providing matriculated students (like Plaintiff) with *any indication the Change was coming* - despite the fact that the Defendant Trustees were contemplating such a Change for quite some time, and could very easily have done so; as a result, the last-minute-change in Graduation Degree Requirements the Defendant School imposed on the students (including the Plaintiff) was unexpected and unpredictable, and in fact directly resulted in a substantially increased workload and cost to the Plaintiff (i.e., to secure the same Degree he was already on track to earn pursuant to the parties existing Contract) without justification or any additional consideration provided by the Defendant School; and

k) the Defendant School implemented the Change *capriciously* - by rendering notice of the Change suddenly and without *any indication the Change was coming*, along with very little time before the new Degree Requirement became effective and applicable to the Plaintiff (i.e., for all intents and practical purposes, the Change was effective immediately).

71.     Interestingly, the Defendant School <u>now</u> claims that it did <u>not</u> <u>follow</u> <u>its</u> <u>own</u> <u>newly changed</u> degree requirements (i.e., as set out in the "Notice of Change" delivered to Plaintiff in May 2010) and has <u>not</u> (for some yet undisclosed reason) *automatically* (i.e., as per its prior admonitions to Plaintiff) "voluntarily withdrawn" the Plaintiff from the degree program in which he enrolled.

72.     Whatever its purpose or design in doing so, the fact is, the Defendant School, by not (formally) withdrawing the Plaintiff from the degree program, once <u>again</u> changed the Plaintiff's degree requirements <u>unilaterally</u> (i.e., in essence, "changing the <u>change</u>"), and once again, it purportedly did so without informing Plaintiff of this new "change," nor providing Plaintiff and justification or notice to Plaintiff.

73.     Although, by failing to timely to perform the rather ministerial act (i.e., of "voluntarily withdrawing" the Plaintiff from the degree program (i.e., in strict accordance with the terms of the "Notice of Change"), the Defendant School is apparently seeking to mitigate the extensive injury that its wrongful acts have caused Plaintiff, that <u>purposeful</u> waiver of the "right" the Defendant School once claimed to have is both telling (i.e., indicating that the Defendant School *itself* realizes it is on thin ice here); and harmful (by holding the Plaintiff's Degree "hostage" as it were, and keeping his status as student in "limbo"), the Defendant school effectively prevents the Plaintiff from taking the Step 2 on his own, while the clock (time limit) for taking and passing the Step 2 Exam on his own (i.e., if he so desired).

74.     Taken individually, or as a whole, the wrongful conduct and actions taken by Defendant Board and Defendant School in this matter constituted bad faith and/or material breaches of the Parties' Contract, including, but not limited to: a) the Defendant Board negotiating, discussing, drafting, and finally, unilaterally implementing a material and

substantive Change in Plaintiff's degree requirements, all of this accomplished in relative secrecy; b) by promulgating and delivering the purported "Notice" of its intent to unilaterally Change Plaintiff's degree requirements in an unprofessional, unreasonable, and untimely manner, with *less than one year to go in his degree program*;  c) through the use of an unreasonable and unjustifiable "effective" date for the Change, which essentially, and for all practical purposes, imposed the Change upon Plaintiff effective immediately, without any opportunity for exceptions or appeal); d) by issuing the Change to Plaintiff without any reasonable warning or prior disclosure; e) by implementing the Change despite it being substantively inadequate, devoid of any option, alternative or exception, and delivering it to the Plaintiff at a point in his academic progress toward his anticipated degree when Plaintiff had satisfied virtually all of the requirements and conditions set out in the catalogue and contract, causing him a substantial forfeiture; and f) by implementing a substantive, material, and substantial change in Plaintiff's Graduation Requirements.

75.     In anticipation of his May 2011 graduation date, the Plaintiff performed all obligations under the Parties' Contract, and all conditions precedent to the Defendant School's duty to confer his degree have been satisfied – except payment of his $500 graduation fee – and at such time, and to this day, Plaintiff has stood ready and willing to perform that final obligation.

76.     Despite the fact that the Plaintiff has a) completed all of the degree requirements identified in the Catalog and parties' Contract; b) paid the Defendant School substantial moneys in tuition, fees and various expenses, and satisfied all condition precedents set out in same, the Defendant School has wrongfully refused to convey upon Plaintiff him the degree he earned, constituting a material breach of the Parties' Contract.

77.     In sum, and as alleged in greater detail above, the Defendant School *materially breached* the Parties' Contract in <u>numerous</u> ways, including, but not limited to:

a. The Defendant School breached the parties' Contract by failing *to act in good faith* when, despite knowing it intended to change the Plaintiff's degree requirements before he would graduate, did not <u>disclose</u> that information to its students, including the Plaintiff; all the time knowing that had the Plaintiff <u>known</u> the Defendant School was even <u>contemplating</u> this Change, he (and others) would have <u>transferred</u> <u>away</u> from the school immediately to avoid being left without any reasonable alternative to the changed Degree Requirements; and

b.     The Defendant School breached the Parties' Contract by anticipatorily repudiating its terms, and indicating a prospective unwillingness to perform in accordance with those terms when it delivered the "Notice of Change" by arbitrarily imposing the changed Degree Requirements on students, like Plaintiff, with less than a year to go in their degree program; and

c. the Defendant School breached the Parties' Contract by arbitrarily and capriciously imposing the changed Degree Requirements on final-year Students, like Plaintiff, who were already fully- matriculated, about to graduate, and for which the mandatory change *would produce no academic benefit whatsoever* (i.e., to <u>either</u> party); and

d. the Defendant School breached the Parties' Contract by failing to provide students, like Plaintiff with sufficient time or resources (as it had done with the Step 1 Exam), so as to properly assist them in passing same;

e. the Defendant School breached the Parties' Contract by failing to satisfy its obligation to provide students like Plaintiff with only *qualified* instructors, and misrepresenting instructor credentials (or negligently permitting instructors to do so) to students, including but not limited to Plaintiff; and/or

f. the Defendant School breached the Parties' Contract by failing to arrange, maintain, and/or provide financial aid for its students, including Plaintiff, between 2008 and 2011.

78.     The Defendant School's failure to deliver to Plaintiff the degree he earned, and the various other material breaches as noted above, were the direct and proximate cause of substantial injury and danger to the Plaintiff, said injuries and damage being a reasonably foreseeable consequence to the Defendant at the time of its breach.

Wherefore, Plaintiff Maraj Kidwai requests a jury trial on all issues so triable and demands judgment from the Defendant School for breach of contract in an amount exceeding the jurisdiction of this court and/or for any other relief the Court itself deems necessary and appropriate under the facts and circumstances as developed at trial, including but not limited to:

a) Specific performance of the parties' Contract, requiring the Defendant School to properly confer the appropriate degree on Plaintiff, making said conference *retroactive* to Plaintiff's originally anticipated graduation date; and/or in the alternative, b) all money damages Plaintiff incurred as a result of the Defendant School's failure to perform in accordance with the Contract terms, including, but not limited to: i) any and all compensatory damages, including cost and expenses Plaintiff incurred to apply, transfer, attend and matriculate to Defendant University; and ii) all damages for loss of  employment opportunities (for approximately four (4) years) occasioned by the Plaintiff's attendance at the Defendant University; and such other compensatory relief that this court deems necessary and proper;

b) Consequential damages for the reasonably estimated, via expert testimony, loss of future employment and reasonably ascertainable future income (for a period/duration not to exceed the years remaining in the Plaintiff's s actuarial life) that flow as a direct, reasonably foreseeable, and proximate consequence of the Defendant School's breach of the Parties' Contract, and its refusal to timely confer upon Plaintiff the diploma he had earned;

c) Incidental damages as proven by the evidence;

d) Attorney's fees, reasonable costs and other similar relief.

## COUNT II:
## FOR FRAUD, FRAUDULENT INDUCEMENT TO CONTRACT, AND NEGLIGENT MISREPRESENTATION AS AGAINST THE DEFENDANT SCHOOL

79.     All facts alleged above in paragraphs 1-56 are realleged and reaverred in this Count II as is fully set out herein.

80.     More particularly for this Count II, and as alleged more generally above, the Defendant School made numerous Misrepresentations of fact to the Plaintiff, intending to use those representations to <u>induce</u> Plaintiff to <u>apply</u> and pay substantial amounts of money in

"tuition" and "fees") to the School; such Misrepresentations, include, but are not limited to, the

following:

a. The Defendant School represented that its students' pass rate on the USMLE Step I Exam was "above 90%," and was "on parity" with students from U.S. medical schools, and "far above the average level of students from other non-U.S. schools [61%]."

b. The Defendant School represented that the maximum class size was "90 students."

c. The Defendant School represented (i.e., that *through the efforts of its Co-Defendant Board of Trustees*) it would "ensure that members of the Faculty were qualified for their appointment."

d. The Defendant School represented to Plaintiff that (*through its Co-Defendant Trustees*) it would "ensure that members of the Faculty were … able to competently perform their function."

e. The Defendant School represented to Plaintiff that it was an "expert" in the "financial aid process" and that "both loan and scholarship programs are available to assist you in funding the full cost of your education."

f. The Defendant School  represented (*via* conspicuous <u>omission</u>) from that the School's stated Graduation Requirements for the degree the Plaintiff was seeking *did not include* taking and passing the USMLE Step 2 Exam.

g. The Defendant School represented that it was in full compliance with the Guidelines set out by its accrediting agency ACCM.

h. The Defendant School made numerous other representations or utilized otherwise "shady" marketing techniques to induce students like plaintiff to apply and attend, including, but not limited to:

   1. referring to itself in media and on the internet as a "University," when in fact, it is an educational entity with a student population barely the size of a small high school;

   2. use of the acronym "SMU" in an almost-too-obvious attempt to confuse potential students into think the School is some way Affiliated with "Southern Methodist University" – *which of course it is not, and could <u>never</u> be;* and

3. actually naming itself "St. Matthews" in an attempt to make it sound to potential students like it is has some sort of "religious" or not-for-profit affiliation - *which of course it does not*.

81.     Each of various Misrepresentations described with more particularity above, (referred to collectively as "the Misrepresentations") were: a) false, misleading, inaccurate, and/or untrue; and b) at the time they were made by Defendant School to the Plaintiff, the Defendant School either knew, or should have known them to be false. Misleading, inaccurate or untrue.

82.     The Defendant School <u>absolutely</u> <u>intended</u> the Misrepresentations it made to Plaintiff to induce Plaintiff to enter into a Contract with it for the delivery of educational services in exchange for <u>substantial</u> consideration.

83.     The Misrepresentations made by the Defendant School on its Website and elsewhere were of the nature and type any reasonable person, looking for information regarding a University's degree requirements, would reasonably rely on as being truthful and accurate.

84.     The Misrepresentations made by the Defendant School were in fact *material* to Plaintiff's decision to seek admission and degree at the Defendant School (and pay to it substantial consideration in exchange).

85.     The Plaintiff *reasonably relied* on the Misrepresentations made by the Defendant School when deciding to seek admission and matriculate toward a degree.

86.     In reasonable and justifiable reliance on the Defendant School's Misrepresentations, on or about December 2006, the Plaintiff officially transferred from St. George's Medical School in Grenada to Defendant School, matriculating as a degree-seeking medical student.

87.    As direct, reasonably foreseeable, and proximate consequence of Plaintiff's reliance on the Defendant School's Misrepresentation, Plaintiff has incurred substantial detriment and monetary damages, including but not limited to:

a. the loss of "time" spent (i.e., over the period of more than 3 years) in attending classes and preparing for same (i.e., in terms of lost wages and other appreciable damages);

b. the loss of opportunity to attend another medical school and secure his medical degree, and the "*stigma*" attached to his "failure" to receive the degree he earned at the Defendant School; and

c. the costs and expenses of attending classes and prepping for same, along with appropriate housing and transportation costs.

WHEREFORE, Plaintiff Maraj Kidwai demands a jury trial and judgment from the Defendants for fraud and/or negligent misrepresentation, for:

1.   Compensatory damages, in an amount which includes recovery of all application, and administerial fees, all tuition, all housing costs, all travel expenses, and any other funds, monies or consideration, of any type and kind that Plaintiff delivered to the Defendant School (or its agents and related corporate entities) in reasonable reliance on said Misrepresentations; and

2.   All other money damages Plaintiff incurred as a direct and proximate consequence of the Defendant School's Misrepresentations, including those paid or delivered to third parties, such as testing agencies and attorneys, as a direct result of his reasonable reliance on the Defendant School's numerous Misrepresentations; and

3.   Any and all damages for lost wages and opportunities, including all damages, cost and expenses that Plaintiff has or will incur for loss of employment opportunities (for approximately four (4) years) occasioned by the Plaintiff's attendance at the Defendant School and shortly thereafter; and

4.  Consequential damages for the reasonably damages Plaintiff will have incurred (estimated, *via* expert testimony), due to the reasonably foreseeable loss of future employment and any amount of reasonably ascertainable income he would have generated (over the course of Plaintiff's actuarial age), a jury can determine same as a direct and proximate consequence of the Defendant School's fraudulent conduct here, along with its wrongful refusal to confer upon Plaintiff the degree he had earned; and

5.   Punitive or exemplary damages in an unknown and unlimited amount (i.e., in light of the intentional and wrongful conduct alleged herein), set by appropriate principles of law, and  only after and upon proper motion, hearing, and Court order; and

6.   All reasonable attorney's fees and costs of litigation.

## COUNT III:
## BREACH OF FIDUCIARY AS AGAINST THE DEFENDANT BOARD OF TRUSTEES

88.     All facts alleged above in paragraphs 1-56 are realleged and reaverred in this Count as is fully set out herein.

89.     As described with more particularity herein, the Defendant School is a for-profit corporate entity – and through its express representations, policies and practices, established its Board of Trustees (also named Defendants here) as having a fiduciary relationship with the students of the Defendant School, including, of course, the named Plaintiff.

90.     More specifically, and as described with more particularity herein, upon his admission and matriculation at the Defendant School in January 2007, the Plaintiff reposed all trust and confidence in the Defendant School, and more specifically, in the Defendant Board of Trustees, and the Defendant School and Trustees *accepted* that responsibility of trust and confidence – in exchange for substantial consideration (i.e., in the form of his commitment of his time and his academic labor – in addition considerable amounts of money he paid the Defendant School in tuition and fees).

91.     According to the express wording of the *School Catalogue*, the primary purpose of the Defendant Board of Trustees was to "provide *supervisory machinery* independent of management" clearly indicating that the "supervision" of the Defendant school was in the hands of its three named Trustees.

92.     According to the  express wording of the *School Catalogue*, at all times material hereto, the various fiduciary duties the Defendant Board of Trustees owed to <u>students</u> (like Plaintiff) included, but were not limited to:

a.  "ensure that the rules and regulations of the University [met] the highest levels of propriety;"

b.  "ensure that members of the faculty [were] qualified for appointment and they [were] able competently to perform their function;" and

c.  "exercise supervision of the needs of the student body and recommend steps to make provision for the welfare of the students and the successful pursuit of their studies."

93.     As fiduciaries to the Plaintiff, the Defendant Trustees, individually, and collectively as a "Board," had the strictest obligations of trust and confidence, and at the very least were required to <u>disclose</u> all facts material the academic and educational well-being of the students, and not act in any way that would injure those students without sufficient, articulable justification.

94.     The Defendant Board of Trustees, as fiduciaries to the Plaintiff, had an obligation to advise, counsel and protect students like Plaintiff (i.e., within the confines and logical constructs of its founding purposes); but instead, the Defendant Board of Trustees *breached* their fiduciary responsibilities to the Plaintiff and to his fellow classmates by:

a.  Conducting its negotiations and discussions (and it ultimately, the crafting of its final decision) to Change the Plaintiff's Degree Requirements in secret – failing to <u>disclose</u> to the Plaintiff that it was contemplating the Change – in a timely enough fashion that Plaintiff would have alternatives to the Change the Board imposed, and not be caused to forfeit everything he has paid and worked for because of the Board's arbitrary, capricious, unjustified and untimely imposition of a Change it did not even have the contractual authority to implement under the School's Catalogue and the parties' Contract; and

b.  Using its authority and influence over the Plaintiff to effect the Change, even though the Defendant Trustees <u>knew</u> the Change would provide him with no appreciable benefit, was wholly unjustified and unwarranted in academic or

educational terms, untimely, and providing him absolutely no exceptions, options or alternatives; and

c.  Failing to ensure that "members of the faculty [were] qualified for appointment and [were] able competently to perform their function" (i.e., in at least in <u>one</u> case Plaintiff has uncovered, and presumably more that will be uncovered when discovery commences and Plaintiff has the opportunity to examine the <u>entire</u> faculty's credentials as they existed during the years that the Plaintiff attended); and

d.  Failed to "exercise supervision of the needs of the student body and recommend steps to make provisions for the welfare of the students and the successful pursuit of their studies" when through mismanagement and poor evaluations from numerous entities, combined with an increasingly high rate of attrition and loan default, it permitted the school to lose most, then all, of the financial aid partners it had advertised to Plaintiff were available at the time of his detrimental reliance, matriculation, admission and on entering into the fiduciary alleged herein with the Defendant Trustees.

WHEREFORE, Plaintiff Maraj Kidwai demands a jury trial and judgment from the Defendants for fraud and/or negligent misrepresentation, and respectfully requests this Honorable Court to issue an order decreeing final judgment for the following forms of relief, and other relief or remedy the Court itself deems necessary and appropriate:

1.  Compensatory damages, in an amount which includes recovery of all application, and administerial fees, all tuition, all housing costs, all travel expenses, and any other funds, monies or consideration, of any type and kind that Plaintiff delivered to the Defendant School (or its agents and related corporate entities) in reasonable reliance on said Misrepresentations; and

2.  All other money damages Plaintiff incurred as a direct and proximate consequence of the Defendant School's Misrepresentations, including those paid or delivered to third parties, such as testing agencies and attorneys, as a direct result of his reasonable reliance on the Defendant School's numerous Misrepresentations; and

3.  Any and all damages for lost wages and opportunities, including all damages, cost and expenses that Plaintiff has or will incur for loss of  employment opportunities (for approximately four (4) years) occasioned by the Plaintiff's attendance at the Defendant School and shortly thereafter; and

4.  Consequential damages for the reasonably damages Plaintiff will have incurred (estimated, *via* expert testimony), due to the reasonably foreseeable loss

of future employment and any amount of reasonably ascertainable income he would have generated (over the course of Plaintiff's actuarial age), a jury can determine same as a direct and proximate consequence of the Defendant School's fraudulent conduct here, along with its wrongful refusal to confer upon Plaintiff the degree he had earned; and

5.   Punitive or exemplary damages in an unknown and unlimited amount (i.e., in light of the intentional and wrongful conduct alleged herein), set by appropriate principles of law, and  only after and upon proper motion, hearing, and Court order; and

6.   All reasonable attorney's fees and costs of litigation.

### COUNT IV:
### FOR "RELIANCE" DAMAGES (PROMISSORY ESTOPPEL) AND OR ENFORCEMENT AS AGAINST THE DEFENDANT SCHOOL AND THE DEFENDANT BOARD OF TRUSTEES

95.    All facts alleged above in paragraphs 1-56 are hereby realleged and reaverred in this Count as is fully set out herein.

96.    As alleged with more particularity above, both the Defendant School and Defendant Trustees made numerous representations, statements, and promises to the Plaintiff, both before and during his attendance at the Defendant School; and more specifically, and as pertinent to this Count, the Defendant School clearly represented to the Plaintiff that the Step 2 Exam was not a requirement for the degree he was seeking (i.e., by not including that specific requirement in its degree requirements), and the Defendant Board of Trustees clearly and affirmatively covenanted to Plaintiff that it would "exercise supervision of the needs of the student body" (which of course included the Plaintiff and others similarly situated) and would "recommend steps to make provision for [Plaintiff's] welfare" and for the "the successful pursuit of [his] studies."

97.    As alleged with more particularity above, the representations, statements, and promises made by the Defendants here were of the type and kind that one would reasonably

expect a potential student (like the Plaintiff) to rely upon, and be induced to act in a certain way (i.e., to wit; apply to the Defendant School, matriculate, and pay substantial amounts of money to do so).

98.     As alleged with more particularity above, Plaintiff reasonably relied to his detriment on the numerous Misrepresentations Defendant School made to him, both before and during his attendance at the School; and more specifically, Defendant School specifically represented to the Plaintiff that his degree requirements did not include taking and passing the Step 2 Exam.

99.     As alleged with more particularity above, Plaintiff incurred substantial damages as a direct and proximate consequence of the Plaintiff's "reasonable reliance" on the Defendant School's representations, statements, and promises, and most significantly, the Plaintiff has still not received from the Defendants the Degree they promised him – and which he earned performing arduous tasks and paying substantial sums of money - all *in reliance on* the various representations, statements, and promises the Defendants made.

100.    As alleged with more particularity above, and in light of the facts and circumstances of this case, injustice can only be avoided by the Court enforcing the representations, statements, and promises made by the Defendants here, and awarding the Plaintiff any other damages or relief the Court deems appropriate.

WHEREFORE, to the extent any damages or injuries are not covered by prior Counts alleged herein, Plaintiff Maraj Kidwai requests jury trial and demands judgment from the Defendants grounded in the doctrine of promissory estoppel, and respectfully requests this Honorable Court to issue an order decreeing final judgment for the following forms of relief, and other relief or remedy the Court itself deems necessary and appropriate:

1. *Enforce the various* representations, statements, and promises made by the Defendants, and more specifically, order Defendants to convey upon Plaintiff  the degree he earned in reliance on those representations, statements, and promises, making said conference *retroactive* to Plaintiff's originally anticipated graduation date; and/or in the alternative, b) all money damages Plaintiff incurred as a result of the Plaintiff's reliance on the Defendants' representations, statements, and promises including, but not limited to: i) any and all compensatory damages, including cost and expenses Plaintiff incurred to apply, transfer, attend and matriculate to Defendant University; and ii) all damages for loss of  employment opportunities (for approximately four (4) years) occasioned by the Plaintiff's attendance at the Defendant School; iii) recovery of all application, and administerial fees, all tuition, all housing costs, all travel expenses, and any other funds, monies or  consideration, of any type and kind that Plaintiff delivered to the Defendants or their agents or employees in reasonable reliance on same; iv) and all other money damages Plaintiff incurred as a direct and proximate consequence of Plaintiff's reliance on the Defendants' representations, statements, and promises, including those paid to third parties, such as testing agencies, attorneys, etc.; v) any and all damages for lost wages and opportunities,  including all damages, cost and expenses that Plaintiff  has or will incur for loss of employment opportunities (for approximately four (4) years) occasioned by the Plaintiff's attendance at the Defendant School and shortly thereafter; and

2. Award Plaintiff all reasonable attorneys' fees, and costs of litigation, as component of his "reliance" damages, as appropriate.

## COUNT V:
## FOR DECLARATORY AND OR INJUNCTIVE RELIEF AS AGAINST THE DEFENDANT SCHOOL AND THE DEFENDANT BOARD OF TRUSTEES

101.   All facts alleged above in paragraphs 1-56 are realleged and reaverred in this Count I as is fully set out herein.

102.   As alleged with more particularity above, in contradiction to the Defendants' wrongful attempt to Change the Plaintiff's Degree requirements (i.e., as represented in the purported "Notice of Change"), the Defendants claimed to be changing the degree Requirements so that Plaintiff would not get the degree he earned unless he strictly complied with the terms and conditions of the Change, as expressed in the Notice of Change (and subsequent correspondence from the Defendant School).

103.    As also alleged with more particularity above, in the "Notice of Change" (as well as *subsequent* correspondence sent from the Defendant School to the Plaintiff) the Defendants *threatened* the  Plaintiff with the most severe penalty available – that he would be *"involuntarily withdrawn"* from the degree program he was enrolled - the moment he failed to comply with the strictest terms of the unilateral Change the Defendants were imposing on him in his last year of school; and as discussed, the Notice of Change offered Plaintiff no alternatives, exceptions, options, or avenues of appeal, and was unequivocal in that pronouncement.

104.    As alleged with more particularity above, the Plaintiff did not comply with the terms of the Change; thus as a consequence of the "Change" he should have been "involuntarily withdrawn" (i.e., as the Defendants had *threatened* him they would do, despite his completing his degree prom in exemplary fashion).

105.    However, and again, as alleged with more particularity above, despite the Plaintiff's failure to comply with their wrongful and untimely directives, and pursuant to yet another unknown, undisclosed rationale, the Defendants have purposely chosen not comply *with their own terms of their Change* (in essence, making a second "unilateral" attempts to alter the terms of the Parties' Contract), and for some reason have failed and/or purposely declined to "involuntarily withdraw" the Plaintiff as they had originally threatened to do in the Notice of Change and elsewhere, leaving the plaintiff in "limbo."

106.    As alleged with more particularity above, there exists here a "bona fide, actual, present and practical need for a judicial declaration" as to whether the Plaintiff is entitled to the degree he earned under the Parties' Contract.

107.    As alleged with more particularity above, the Parties' positions here are wholly antagonistic to one another (i.e., as plaintiff genuinely believes he does not legally have to

comply with the Change - the Defendants do; the Plaintiff thinks is entitled to the degree he earned; and Defendants have steadfastly refused to confer that Degree to Plaintiff).

WHEREFORE, Plaintiff Maraj Kidwai respectfully requests this Court to issue a judgment declaring that the Defendants must confer upon Plaintiff  the degree Plaintiff earned, making said conference *retroactive* to Plaintiff's originally anticipated graduation date - and such other compensatory relief that this court deems necessary and proper;

### COUNT VI:
### FOR TEMPORARY INJUNCTIVE RELIEF AS AGAINST THE DEFENDANT SCHOOL AND THE DEFENDANT BOARD OF TRUSTEES

108.    All facts alleged above in paragraphs 1-56 are realleged and reaverred in this Count I as is fully set out herein.

109.    As alleged with more particularity above, pursuant to the Defendants have committed numerous intentional and wrongful acts that have caused, and are continuing to cause the Plaintiff irreparable harm, for which he will have no adequate remedy at law, including but not limited to the continuing and expanding "stigma" that will attach to his future search for employment when Plaintiff is forced to "explain" the substantial "gap" between when he graduated, and when he actually earned his degree, as well as the substantial loss of (hard to ascertain) income and years of practical experience, and the damage to his reputation as a physician.

110.    The public interest would best be served here if the Plaintiff received his degree and permitted to attempt to practice as a physician (which is what the Defendant School trained him for), and in seeing that "for-profit" School (like the Defendant) are held to their promises – even if they set up "off shore" for whatever reason.

WHEREFORE, Plaintiff Maraj Kidwai respectfully requests this Court to issue a judgment declaring that the Defendants must confer the appropriate degree on Plaintiff, making said conference *retroactive* to Plaintiff's originally anticipated graduation date; and that it temporarily enjoins the school from "voluntarily withdrawing" the Plaintiff, and instead order the Defendant School to comply with the terms of the parties Contract, and confer up the hard-working Plaintiff the degree he earned.

Respectfully submitted,

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing was filed with the Court using CM/ECF on October 22, 2012.  I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically filed Notices of Electronic Filing.

*/s/Scott A. Mager, Esq.*
Scott A. Mager, Esquire
Florida Bar No. 768502
scott@magerlawyers.com
MAGER LAWYERS, LLC
2300 East Oakland Park Boulevard
Suite 206
Fort Lauderdale, FL 33306
(954) 763-2800 (tel)
(954) 763-2885 (fax)
Attorneys for Plaintiff

# SERVICE LIST

Daryl J. Lapp – Trial Counsel
EDWARDS WILDMAN PALMER LLP
111 Huntington Ave.
Boston, Massachusetts 20199
(617) 239-0100 (telephone)
(617) 227-4420 (facsimile)
dlapp@edwardswildman.com

Joseph D. Rutkowski
EDWARDS WILDMAN PALMER LLP
111 Huntington Ave.
Boston, Massachusetts 20199
(617) 239-0100 (telephone)
(617) 227-4420 (facsimile)
jrutkowski@edwardswildman.com

Simeon D. Brier
EDWARDS WILDMAN PALMER LLP
525 Okeechobee Blvd., Suite 1600
West Palm Beach, Florida 33401
(561) 833-7700 (telephone)
(561) 655-8719 (facsimile)
sbrier@edwardswildman.com